**KEMMERER, Plaintiff-Appellant, v. KEMMERER, Trustee, Defendant-Appellee.**

Ohio Appeals, Second District, Franklin County.

No. 5232. Decided March 13, 1956.

James B. Albers, Columbus, for plaintiff-appellant.
Marion A. Ross, Columbus, for defendant-appellee.

(FESS, J, of the Sixth District, sitting by designation in the Second District.)

## OPINION

By FESS, J.

Appeal on questions of law and fact from a judgment by the Common Pleas Court for the defendant.

In 1932, plaintiff's decedent, Peter W. Kemmerer, entered into a trust agreement, as donor of certain items of personal property, with his son Paul, as Trustee. After the son's death, on October 6, 1947, decedent executed an amendment to the 1932 agreement reciting the death of the son, that the assets of the trust then consisted of cash on hand and real estate located at 1101 Dublin Avenue, Columbus, Ohio. The amended agreement conveyed and transferred the assets to Donor's daughter-in-law, Margaret A. Kemmerer (defendant herein) to have

and to hold the same as Trustee pursuant to the provisions of the 1932 agreement as amended. The amendment provided that the Trustee should pay to the Donor the net income from the trust periodically, as well as part of the principal upon request of the Donor. Upon the death of the Donor, the Trustee was directed to pay the funeral expenses, provide a grave and monument, pay $1500.00 to Alice M. Trapp (his daughter) and the remainder to the two sons of the Trustee. On November 11, 1947, the Trustee and the Donor's attorney placed $9790.00 in currency in a safety deposit box as part of the trust res. On October 6, 1947, decedent conveyed to Margaret A. Kemmerer, Trustee, by warranty deed, the Dublin Avenue property. The deed was recorded June 14, 1948, and the 1932 Trust Agreement and the 1947 amendment were recorded in July, 1948.

In the 1932 agreement, the Donor reserved the exclusive right at any time to alter, amend, modify or revoke in whole or in part the trusts.

In September, 1948, Peter W. Kemmerer filed an action in the Common Pleas Court seeking to set aside the trust. In this action, the Court recognized that the Donor had the right to revoke the trust, but by reason of confusion exhibited by the Donor in his testimony, found the Donor did not understand the import of a revocation of the trust which he had signed on August 20, 1948. The decision was rendered June 10, 1949, but the judgment for defendant was not entered until January 9, 1950.

After the adverse decision, on application of his daughter, Alice M. Trapp, the Probate Court on August 11, 1949, found Peter W. Kemmerer, age 83, a mentally incompetent person, and appointed John S. Dunkle, his then attorney, as guardian of the estate. On September 14, 1949, Dunkle, as guardian, filed an action in the Probate Court against Margaret A. Kemmerer, Trustee, seeking to set aside the deed of October 6, 1947, and the removal of the defendant as Trustee. On December 13, 1949, the Probate Court sustained a demurrer to the petition. Apparently, this action has not been journalized nor the petition dismissed.

On January 14, 1950, on application of Dunkle therefor, the guardianship was terminated by the Probate Court. The entry filed September 14, 1950, recites that upon the evidence the Court finds that Peter W. Kemmerer has recovered his normal mental condition, orders the guardianship terminated and restores the ward to the full control of his property.

On July 31, 1953, by formal instrument executed by Peter W. Kemmerer, the Trust was revoked and notice thereof given to the defendant. The instant action was commenced August 26, 1953. After setting forth the 1932 Trust Agreement with its provision for revocation, the 1947 amendment, the revocation and notice thereof, plaintiff prays that the defendant be ordered to reconvey the Dublin Avenue property to plaintiff and for other and further relief. Peter W. Kemmerer's deposition was taken in October, 1953, and also on December 21, 1953, ten days before his death on December 31, 1953. The action was revived in the name of his executor.

In her answer, defendant denies the revocation of the Trust, and

alleges that from January 1, 1948, to date of his death, the Donor did not have the physical, or mental, capacity to modify or revoke the terms and conditions of the Trust; that since January 1, 1948, Donor had been in a confused mental and physical state and had dissipated large sums of money belonging to the trust estate. She sets forth the adjudication of the Probate Court in September, 1949, and that since that time Peter W. Kemmerer had not been adjudicated competent. She also contends· that the issues raised are res judicata by reason of the judgment in the action brought in the Common Pleas Court.

The sole question to be determined upon this trial de novo upon a voluminous record of more than 900 pages of testimony, interspersed with innumerable objections and extensive arguments of counsel, is whether Peter W. Kemmerer, on July 31, 1953, had sufficient mentality to understand the nature of the revocation which he then executed. Much testimony was received tending to show that the decedent was unduly influenced to revoke the trust by his daughter, Alice M. Trapp. Since undue influence is not an issue in the case, such testimony bears only upon whether the decedent appreciated the result of his revocation and the consequences thereof. In other words, did the aged man desire to revoke the trust and did he know what he was doing when he signed the instrument? Prima facie, the revocation is valid, and the burden of proving the decedent to be incompetent is upon the defendant.

With regard to the adjudication of incompetency by the Probate Court, all persons are presumed to be sane until proven insane. No presumption of insanity can arise until a permanent mental disorder is proven to exist. When once established, the law will presume that condition to continue for a reasonable length of time. But this presumption of continuance of such insanity is rebuttable and is removed when sufficient evidence has been introduced to meet, extinguish, rebut, countervail or overcome such presumption arising from the adjudication of insanity. **Kennedy v. Walcutt, 118 Oh St 442.** In the instant case, no commitment was made nor was a guardian of his person appointed. Within a few months after the adjudication upon the evidence, the court found Peter W. Kemmerer had recovered. The adjudication of incompetency, as well as his restoration, are matters to be considered by this court together with the other circumstances disclosed by the evidence in determining the issue.

The testimony with respect to the competency of the decedent is in sharp conflict,—on behalf of the plaintiff, tending to show that on the day he signed the instrument he understood the significance of his revocation and wanted back his property;—on behalf of the defendant, the evidence discloses that when he was examined by a neurologist and psychiatrist on June 15, 1949, incident to the application for adjudication of incompetency, the doctor reported that Mr. Kemmerer was,

"quiet, agreeable, and cooperative until his present difficulties were discussed. He then became excited, over-active and mentally confused. His stream of mental activity was coherent and logical except for the above when he was then unable to give logical answers to questions. The mood was quite shallow. His emotional responses not being in keep-

ing with the thought content. He showed considerable emotional instability, laughing or crying at the slighest provocation. No hallucinations were elicited nor does he seem to be reacting to any. He is oriented for place and person. He has a proper grasp on remote events, but has a poor grasp on recent events. He did poorly on the tests for retention and immediate recall. He has no insight into his condition, and judgment is impaired.

"It is my opinion, as the result of the above examination and the history of the case, that Mr. Kemmerer is suffering from cerebral arteriosclerosis with senile changes. It is my further opinion that this man is now mentally incompetent, and that he was incompetent when in the hospital prior to his operation."

At the trial, this physician verified his diagnosis of 1949 and in answer to a question as to whether it was probable that a man eighty-three years old, adjudged incompetent on August 11, 1949, who was suffering from cerebral arteriosclerosis with senile changes, would ever be competent, said that he would probably never be competent. This opinion was corroborated by a Dr. Henry Luidens, an experienced phychiatrist. In answer to a hypothetical question, the doctor stated that in his opinion "the nature of the illness (cerebral arteriosclerosis) is of itself the result of damage to brain tissue, which can not be repaired, does not improve, and in no case has ever shown itself to be restored to a normal condition. The older the age, the more likely that is. Of course, it is never repairable at any age, but, of course, it is more severe at older ages." This witness further expressed the opinion that Peter W. Kemmerer was incompetent on July 31, 1953. Medical testimony on behalf of the plaintiff tended to show that an aged person suffering from cerebral arteriosclerosis would have periods of recovery and lucid intervals.

In addition to the medical testimony, the evidence is undisputed that at the time the defendant was appointed trustee, the decedent deposited $9790.00 in cash in a safety deposit box to which the defendant and decedent's then attorney, Ralph Lucas, had access; that without the consent or knowledge of the defendant, Mr. Lucas removed this sum from the box in the spring of 1948 and gave it to decedent. At this time decedent had left the Dublin Avenue home and was residing either in a boarding house or with his daughter. It is of some significance that neither attorney Lucas nor Alice Trapp were called to deny or explain this occurrence. An incident is related by the defendant and her son of the old man returning to the home, taking the boy out in the yard and showing him rolls of bills of large denominations and remarked to the boy "Enough money to choke a horse." When the old man returned to the home on July 21, 1952, after being absent since 1948 except for occasional visits, he complained to defendant that he had no money left and said he had given it to his daughter. There were. however, certain medical, hospital bills and board bills in excess of $1,000.00, which apparently he had paid out of the cash received from Mr. Lucas.

Notwithstanding his statement to his daughter that he had no money left, he apparently had sufficient cash to keep himself supplied with whiskey. In addition to his physical and mental infirmities, he

was an inveterate drinker. There is credible testimony that he became intoxicated daily during the last six months of his life. He was quite deaf and became loud, boisterous, abusive and profane.

Neither the trial judge nor this court has had the opportunity to observe the demeanor of the decedent on the witness stand, but are confined to the dry record of his testimony reported in the two depositions. We admit that it is difficult to appraise the credibility of witnesses on a review such as this. In the main, the incidents related by the witnesses are undisputed and a number of them partially corroborated. The conflict arises from the opinions of experts and lay witnesses with respect to the competency of the decedent.

But, upon a review of the record as a whole, we find that on July 31, 1953, Peter W. Kemmerer did not have the mental capacity to revoke the trust.

Finding and judgment for defendant and petition dismissed at plaintiff's costs.

MILLER, PJ, HORNBECK, J, concur.